May it please the court, I'm Ryan Archer, Assistant United States Attorney out of Billings, Montana. The posture of this case is somewhat awkward because it's both a Montana case and a Washington case. It was first charged as a Montana case, and then when Washington made their charges in the Eastern District, it was removed. Could you answer the question that I had posed to counsel who was just talking? That is, are we basically looking at the sufficiency of evidence standard, or is there some other legal issue here? Your Honor, as far as the Montana case goes, I'm not prepared to address the Washington case, but as far as the Montana case goes, the only issue before this court is sufficiency of the evidence. And is that case I mentioned, Jackson v. Virginia, is that the standard for sufficiency? That is, we would ask, could a rational jury find guilt beyond a reasonable doubt on each of the elements? Yes, Your Honor, I believe that is the issue here. And with regard to the Montana case, the only element that is really being challenged is the intent to defraud. And this court, in other fraud cases, has said time and again that misrepresentations and inconsistent statements can be used to prove intent to defraud. And in this case, essentially when you cut to the quick of this case, Z-Fax, in the Montana case, Z-Fax was a London-based company, and they ordered parts worth $162,000. They paid almost $100,000 for those parts, and they didn't get anything. The payment was supposed to be in three parts, 30 percent upon contracting, 30 percent just prior to shipment, and the remainder after shipment. Z-Fax paid that first 60 percent. Mr. Simon, in fact, said that the parts were ready to ship. He expected shipment to be within a week, and that was on January 7th of 2002 when he said that. So Z-Fax sent that second wire transfer of almost $50,000, and nothing came. The only thing that did come was five months of inconsistent statements, misrepresentations. And, in fact, we don't even have to rely on circumstantial evidence because Mr. Simon's office assistant testified that at that time the business was a hoax. They would take orders in, they wouldn't ship anything out, and they'd collect money. Well, which witness was that that said it was a hoax? Jody Tyson Flynn from the Montana case. Jody Tyson Flynn was the office assistant and bookkeeper who worked in Whitefish, Montana, and she flat out said the business was a hoax. She also testified that Mr. Simon was known to fabricate shipping orders. And, in fact, he gave a shipping order to Z-Fax in this case saying he had $105,000 worth of parts on hand ready to go. Nothing ever came. Basically, as Judge Wardlaw pointed out, the same argument was made at trial that is being made here, which was this was simply just reckless business behavior. I think the evidence shows the contrary, that when you pay for goods nearly $100,000 and you don't get anything, that's crime. That's fraud. Z-Fax was defrauded in the Montana case. Okay, thank you. Thank you. Mr. Harrington, you're addressing the Washington cases. Thank you, Your Honor. Joe Harrington from U.S. Attorney's Office in Eastern District of Washington at Spokane. Judge Wardlaw, I believe you're correct that the defense argued to the jury that this was a case of a reckless businessman. The jury rejected that theory. And, essentially, in this case, the defendants engaged in a fraudulent procurement and fulfillment scheme involving advance payments, for which they bilked numerous individuals from hundreds of tens and tens of thousands of dollars. Judge Gould, I think you're correct with respect to the cases arising from the Eastern District of Washington, that Jackson v. Virginia is the applicable standard of review for the sufficiency of the evidence arguments. And those arguments, I believe, would refer to the specific arguments about whether there's intent to defraud in this case and whether there was a conspiracy that existed. Let me just ask you, because one of the defendants made a Rule 29 motion, and I guess Frederick did not. Correct, Your Honor. Okay, so there's an argument in the briefs about we should review Frederick's under plain error. But really, isn't Judge Gould correct that we have to review them both under the Jackson standard, whether they preserve that 29 motion or not? Your Honor, I think that's a fair analysis. Is that a real difference in review there? That's correct, Your Honor. All right. And, of course, it's the government's position that, with respect to the sufficiency of the evidence arguments, that the trial record fully supports the jury verdict. The factual record plainly demonstrates that any rational juror could have reasonably concluded that both the defendants had the specific intent to defraud, as well as participation in the charged and convicted conspiracy. Well, Manfred argues he didn't have specific intent with respect to all the mail fraud, he wasn't aware of it, and that there's only a few documentary pieces of evidence that link him to it, notifying an officer of the bank. I guess that goes to Pinkerton liability. Was the jury properly instructed on that? One theory would be Pinkerton liability, Your Honor, but there would clearly be some other direct involvement by Manfred O. Simon, which was the father in this case. He was clearly aware of the Montana organization, Engineering International, that closed, and then he and his son moved the business to Spokane, Washington, and established Railway Logistics International. They established a new name, a new bank account, a new location, but basically were engaging in the same modus operandi. The father, Manfred Otto Simon, was responsible for this new entity, Railway Logistics International's bank account. He had to have been aware of all the deposits that went into the account and the apparent lack of withdrawals that would have been paid for materials or any other business transaction shipped to the people of the company. The father, Manfred Otto Simon, was a regular at the UPS store where the company received all its incoming shipments. He submitted a fraudulent paycheck and a letter of employment to the Indianapolis Harley-Davidson dealership in an effort to help his son purchase a motorcycle on credit, and he was copied on many, many e-mails and correspondence throughout the course of the conspiracy. Did the father get calls from customers who wanted their goods or wanted their money back and put them off or say we'll look into it or stuff like that? I believe there were that sort of activity, Judge. The father, Manfred Otto Simon, was holding himself out as the vice president and the CFO of a large multinational corporation with a highly favored balance sheet, all of which was false. He promised to send payment to suppliers within a couple of weeks and then never followed through. Judge Gould, I'd refer you specifically for one example, at the supplemental excerpt of the record at 397 to 398. And he pretended to be unavailable when suppliers would call to resolve payment issues. That's another example, a supplemental excerpt of the record, 401 to 402. So that's sort of the long answer, Judge Wardlaw. I'm saying did you proceed on both theories, that direct evidence was sufficient or any alternative, the other acts were reasonably foreseeable on the part of Manfred? Certainly I think that the government proceeded on direct involvement as well as involvement as a conspirator under foreseeable acts and conduct of an overall conspiracy. If we just take his conduct alone for a second, not Pinkerton issues of conspiracy, can a jury infer, can a rational jury infer fraudulent intent from the kind of communications that he had about, you know, looking into these things or whatever the suppliers or customers were inquiring about? Judge Gould, absolutely. And let me just give you a couple of examples, places to look on the record, and it's the trial exhibits. I'd refer your attention to trial exhibit 1.1. That's the supplemental excerpt for the record, 610 to 22. That's their Railroad Logistics International website. And the website itself shows it to be a multi-international business that's got business transactions throughout the world. That clearly is just false. Trial exhibit number 7.5, which is the company's corporate data sheet, and exhibit number 7.6, which is the company's balance sheet. Those are excerpts of the record at 623 and 624. Both of those show, you know, accounts for the business at upwards of $600,000 when, in fact, the testimony was that there was no money in the bank. So what evidence linked the father to those exhibits? Your Honor, he was holding himself out as the vice president and CFO of the company. He was responding to customers and was actively He knew that there was no parts coming in or business going out and was in communication with various customers through numerous e-mails as well as his son as well. For the Court's further ratification, exhibit number 9-11. That's an excerpt of the record, 640. And exhibit number 33-5, which is a letter of employment. That's an excerpt of the record, 644. Just further evidence to show that this company was fraudulent from the beginning and clearly the father, Manford Otto Simon, had to have known. And that's what the jury determined. Judge Gould, there are two other issues that I think are beyond the question about the Jackson v. Virginia issue. And that is whether the district court abused its discretion in admitting evidence that was inextricably intertwined with the overall conspiracy. And then there's the final issue with respect to the challenge of the sentencing issue in this case. So on the evidence of uncharged conduct, how was the purchase of the Harley Davidson inextricably intertwined? The uncharged conduct, well, with respect to the Harley Davidson matter. It just didn't seem related to the fraud that he helped buy his son a motorcycle. If I could refer the Court's attention to the supplemental excerpt of the record, 644-45. That's exhibit number 33-5. The letterhead was used for the corporation. It was a letterhead from the corporation to suggest that there was employment involved. So it was just more and further evidence of the company being used to provide fraudulent and false information, as well as a paycheck that was sent out. And if I recall the evidence correctly, the company had never issued any payroll checks whatsoever. So this was another false document that was just created to induce the Harley Davidson dealership to engage. So you're talking about the Harley Davidson, Marisa, the letter to whom it may concern, Letter 10-905, was relevant to that purchase? Yes, Your Honor. And that's followed in the record by the paycheck. But they had never issued any payroll checks the whole time, as far as I'm aware of the whole time the company was in operation. So this was just further evidence of showing, you know, just fraud. So apart from the sufficiency of evidence on intent, you've got a question about the admission of the evidence under Rule 404? Your Honor. And you have the reasonableness of the sentence. Correct, Your Honor. Okay, on the admission of the evidence under 404B, what was the evidence again that was admitted and how did it? I had a note that when I read in the briefs, I thought it showed some indication of modus operandi or intent to defraud. But I'm a little lazy on the record right now. Tell me what that evidence was and why you think it came in under 404. Your Honor, I don't believe it came in under 404B. I think the district court determined it was inextricably intertwined with the overall scheme. Okay. And this involved Frederick Manford Simon, who's the son, forming a new company called Double Eagle Management to carry out Railroad Logistics International's mission. And what Double Eagle Management did is they, through the company, they established and obtained a Department of Defense contract to supply equipment to the Army in Baghdad. Okay. And as part of that scheme, and actually what it was was just a continuation of the scheme where they were trying to get advance payments and not produce or not fulfill any type of orders or contracts. So on the one hand, it was a continuing part of the overall scheme in this matter. But second of all, it was necessary to allow the prosecution to give the jury the full and complete story here because what Frederick Manford Simon was doing was telling his customers, I will fulfill the orders as soon as I get payment for this government contract in Iraq. So he was using that sort of as a cover for not fulfilling orders. And the reason that was important, Your Honor, is because without that full explanation, the jury may have been left with the false impression that there was actually and indeed a legitimate contract with the Department of Defense. So it was the government's theory that that evidence was inextricably intertwined and Senior Judge Nielsen agreed with the government and allowed that evidence to be admitted. I'm not seeing it as strongly relevant, but I'm also not seeing it as very prejudicial if it came in terms of the other evidence. But let me ask this. On the sentence, the sentence for the son is about 10 years, right? Yes, Your Honor. I think it was 120 months. So why is 10 years a reasonable sentence as opposed to, say, 5 years? Your Honor, Senior Judge Nielsen calculated the guidelines. He looked at all of the factors under 18 U.S.C. Section 3553. In part of that analysis, I'm sure, is the fact that Frederick Manford Simon was on probation or subject to a probation revocation at the time he was committing the offenses in Montana for which he got convicted, which followed closely on the heels with the convictions out of the Eastern District of Washington. So I suspect in some regard the court realized that there seems to be a significant pattern. There seems to be serious victims involved in this case. And there's financial loss and that in the court's view, the 120 months was a reasonable sentence, which the government agrees with. What did Manford get? I'm sorry, Your Honor? I'm sorry. The son got the 10 years. And that would be Frederick Manford Simon. Right. So what did Manford Otto Simon get sentenced to? Was it about two years? Your Honor, without looking at the record real quick, I believe it was two years. I would also note that Manford O. Simon was at the time around 81 years old. So there was an age difference as well. All right. Thank you, Counsel. Thank you, Your Honors. Is there any rebuttal from Mr. Nino? No. I think the only thing, Your Honor, Mr. Harrington's comments about intertwining of the contract or things in Iraq, I'd like to clarify that a little bit. Frederick Manford Simon did have two government contracts to supply Iraqi railroads with parts. And separate from that, placed people in Iraq and urging them to go around and look for new contracts. And I know there was one person common to both the government contract as well as the placement of the personnel in Iraq. But that's about the only text that I see. I remember then the testimony leads into the placement people testifying that, see, Frederick Manford was trying to get us to attract contracts. And one of them, he was trying to get us killed because it was a very dangerous contract in a war zone. I don't see how that's intertwined with the rest of this case, whether it be the contract with the Department of Defense for Iraqi railroads, or whether it be all the other alleged victims that testified. See, the nexus, all of that, placing people in Iraq to try to get more business, to try to promote his company, to get off the hook.  Counsel, assuming that the Iraq evidence should not have been admitted, what's the prejudice analysis on it? Prejudice analysis would be basically more heat than light. He was accused of attempting to kill his own personnel that he placed in Iraq. Therefore, he was presented as this bad guy. I think certainly that has an effect on the jury. Okay. Thank you. All right. Ms. Glenn. Yes, Your Honor. I just have a brief response in response to Gary's comment. I think he said that there's rumors, e-mails, back and forth, that are sent by the records. And if you look through these records, there were, in fact, there was testimony from a government agent who went through and indicated that out of a thousand I think he found three that were related or had been from, or had signatures of him, and so there were not rumors, statements, possibly just out of service to the department, but I would like to correct you on that. The record also states that Mr. Otto Johnson was not holding himself out, but he was told as a participant that he was. And so one more thing, briefly, he wasn't holding himself out. Other people were. In the O'Donnell case, there was no contact. In fact, there was no correspondence. And by the way, just to clarify my response, that was Agent Frank Carroll from the FBI. In fact, an extra 6,250 of the thousand FBI agents testified that the government had admitted only one of these answers, of which Nancy's name was involved in all of these cases. But he's still here. He's still in Fairfax. CIFA soon on board. And that is the very same thing with Bill E. second thesis of the credit application, according to Bill E. I think it was Arbo, that credit application, Frederick, who dismissed MO as a person. Well, MO didn't hold him out. Likewise, the final person that was in the double equals was James Perlis, who was the person saying that he worked for Frederick Simon, the double equals consultant. And I don't believe it. Therefore, Mr. Perlis didn't show Nancy Simon. Okay, you're starting to go in and out, Ms. Glenn. In fact, we said to Mr. Perlis testimony, he did not, for double equals, he was given an honorary title of being a very positive. Lana, Lana, could you please turn off the speakerphone and pick up the handset? Is speaker off? Yes. Okay, can you hear me? Yes. That's much better, yeah. Okay, I apologize. It's a health issue with a vocal cord problem. And I think where I ended up apologizing for repeating myself, I was just pointing out that the individual who was the purchasing clerk for SUNUG never had contract with Manfred and was never given any information by Frederick to communicate with anyone other than Mr. Furland. And that's where we were with respect to that company. And you asked about the sentencing. He was, Manfred was sentenced to 24 months. He was 81 years old at the time. I think that has some bearing on perhaps, although there's no testimony of that nature, but it may have some bearing on whether or not an individual can be utilized in a capacity that they either do not understand or are not knowingly purposely challenging. Is he challenging his, Judge Gould has a question. Okay. Is the father challenging the reasonableness of his 24-month sentence? No, Your Honor, he is not. It was below the standard range. Okay. That's what I thought. So then it seemed like we had to comment on that length that might be relevant on the 10-year sentence for his son, on the reasonableness of that. But I don't see if there's no challenge to the 24-month sentence. No, there is not because it's within the standard or below the standard range. But my remark with respect to the sentencing was the comment by the judge as to his reasoning being that perhaps Manfred was simply being loyal to his son. And I'm pointing that out, not out of an intent to commit a crime. And it's in the record in my brief that when he was summoned, he wanted to call his son, and it was not for purposes of anything other than moral support is my understanding. So if you have any other questions that the court would like me to answer, I'm happy to do so. I think my questions are answered. Thank you, Judge. Yes, our questions are answered as well. I have no questions. All right. So U.S. v. Frederick Manfred Simon and U.S. v. Manfred Otto Simon and Frederick Manfred Simon is submitted. Thank all counsel. And I think we were adequately able to understand the arguments over the phone, but we will also have a transcript available, too, so that we can review later. Thank you, Your Honor. From Lana C. Glenn, and I can convey the same from Mr. Nino, and also Adoption Incorporated, my brief. All right. Thank you very much, counsel. Thank you. This court will be adjourned for today. Thank you.
judges: Hall, Wardlaw, Gould